IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 12, 2020

## MARCUS THURMAN WADE v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Coffee County**
**No. 44130     L. Craig Johnson, Judge**

_____

### No. M2019-00716-CCA-R3-PC
_____

The Petitioner, Marcus Thurman Wade, filed for post-conviction relief from his two convictions of first degree murder and one conviction of especially aggravated robbery, arguing that he received the ineffective assistance of counsel. The post-conviction court denied the petition. On appeal, the Petitioner contends that trial counsel was ineffective by (1) advising the Petitioner not to testify; (2) failing to request a psychological evaluation of the Petitioner; (3) failing to introduce at the suppression hearing proof of the Petitioner's mental capacity; (4) failing to challenge the racial composition of the jury venire; (5) failing to request funds for expert witnesses; (6) failing to investigate and review motel camera footage; and (7) failing to file a motion in limine to block evidence of the Petitioner's drug transactions. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Matthew S. Bailey, Spencer, Tennessee (on appeal); and Paul D. Cross and Howell G Clements, Monteagle, Tennessee (at hearing), for the Appellant, Marcus Thurman Wade.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Craig Northcott, District Attorney General; and Jason Ponder, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I.  Factual Background

On direct appeal, this court summarized the facts adduced at trial as follows:

> . . . [A]t 10:08 a.m. on October 30, 2010, Coffee County 911 received a call reporting that the . . . bodies [of Richard Elliott and Timothy Gill] had been found in room 123 of the Quality Inn in Tullahoma. When the police arrived, they went into the room and found the victims' bodies. The door showed no signs of forced entry, and the inside of the room showed no signs of a struggle, which led the police to believe that the victims knew the perpetrator or that the perpetrator had a key to the room. Mr. Elliott was lying on his back on the bed closest to the door, and Mr. Gill was lying on his back on the other bed. Mr. Elliott, who weighed 233 pounds, was wearing exercise shorts and socks but no shirt. Mr. Gill, who weighed 372 pounds, was wearing bib overalls and socks. Paramedics arrived and determined that the victims were dead.
>
> The police searched the room but did not find any weapons. They found one bullet hole in the headboard of the bed on which Mr. Elliott was lying, and another bullet hole was in the wall between the two beds. Two nine-millimeter shell casings and two bullets were found in the room. Mr. Gill had thirteen dollars in his pockets, but Mr. Elliott had no money. The police found Mr. Gill's cellular telephone and a cellular telephone belonging to Mr. Elliott's stepdaughter, but Mr. Elliott's cellular telephone was never found. Officer Kennedy said that a "crack pipe" and a bag containing 1.08 grams of crack cocaine were discovered in the room, but he did not specify where. The only fingerprints found in the room belonged to the victims.
>
> During the investigation, the police learned that Ronald and Sharon Nixon, who discovered the victims' bodies, knew both men. Mr. Gill was the best friend of the Nixons' son, Ray. Mr. Elliott also was friends with Ray Nixon and occasionally did odd jobs for the Nixons.
>
> Ronald Nixon testified at trial that around the end of July 2010, Mr. Elliott asked Mr. Nixon to "front" him money, explaining that he was supposed to receive an inheritance of cash and land and that he would repay the money when the

legal proceedings concluded. Mr. Nixon agreed to provide money for Mr. Elliott's room, board, transportation, and cellular telephone "until this estate was settled." Mr. Nixon said that he could not help Mr. Elliott on a long term basis but that he wanted to help Mr. Elliott change his life.

In early September 2010, Mr. Elliott told Mr. Nixon that "that he was going on the payroll of the Winchester Police Department. Mr. Nixon described Mr. Elliott as "evasive" about his job, but he eventually revealed that he was going "to go out as an informant and trap people" and that Mr. Gill was going to help him on one of the jobs.

Mr. Nixon said that he kept "track" of all of the money he spent on Mr. Elliott. On October 28, 2010, Mr. Nixon wrote Mr. Elliott a check for $2,000, and the next day wrote another check for $2,150. Additionally, Mr. Nixon spent over $1,000 for Mr. Elliott to stay in a room at the Quality Inn in Tullahoma for almost the entire month of October 2010. Occasionally, Mr. Elliott's wife, Mitzi Elliott, and Mr. Gill stayed in the room with him. The total amount Mr. Nixon gave Mr. Elliott was approximately $44,000.

Around 9:00 a.m. on October 30, the Nixons went to Ascend Federal Credit Union to meet with Mr. Elliott in order to complete a "real estate deal" that would result in money being deposited into Mrs. Nixon's account. They waited for Mr. Elliott until 9:20 a.m. and then called him but got no answer. They left and drove by Mr. Gill's house and Richard Elliott, Jr.'s house. Eventually, they stopped at the motel when they saw Mr. Elliott's van in the parking lot. Mr. Nixon knocked on the door of room 123 but received no response. He went to the motel office, and Rakish Patel, the motel manager, authorized issuing Mr. Nixon a key.

Mr. Nixon returned to the room, opened the door, and saw the victims lying on the beds in the room. Mr. Nixon did not see any blood and thought the victims were passed out or asleep. He pushed Mr. Elliott's stomach to wake him and noticed that he was cold. Mr. Nixon also attempted to wake Mr. Gill. Mrs. Nixon, who was a registered nurse, checked on

the victims, discovered they were "stiff and cold," and confirmed they were deceased. Mrs. Nixon exited the room and called 911.

On November 1, Mr. Nixon met with Floyd Davis, who was supposedly Mr. Elliott's attorney. Mr. Davis told Mr. Nixon that there was no inheritance. At that point, Mr. Nixon realized "that it was a scam." Mr. Nixon acknowledged that Mr. Elliott previously had "scammed" him on a car deal.

The medical examiner determined that both victims died instantly from a perforating gunshot wound to the head. The shots were fired from a distance over six feet. Mr. Gill had another gunshot wound to his right arm. Toxicology reports showed that both victims tested positive for cocaine and alcohol.

During the investigation into the victims' deaths, the police learned that the victims had spent several months setting up controlled drug buys and acting as confidential informants for the Winchester Police Department. As a result of their work, several people, including Anthony Hill, the [Petitioner's] nephew; JaCarl Fuqua; and Casey Tarrant, were indicted for felony drug offenses. The [Petitioner], however, was not charged.

Viola Stephens, Mr. Gill's aunt, testified that the victims came to her house around 7:40 p.m. on October 2[9], 2010. They had been drinking but were not drunk. Mr. Elliott told Ms. Stephens that he wanted some crack cocaine but could not find anyone willing to sell it to him. Mr. Elliott "flashed a bundle of money," and Ms. Stephens knew he could pay for the drugs. Ms. Stephens asked who his supplier was, and he replied that it was the [Petitioner]. Ms. Stephens called the [Petitioner] and asked if he knew Mr. Elliott and if he would "serve" Mr. Elliott. The [Petitioner] replied "yes" and came to her house five or ten minutes later. He and Mr. Elliott went into the kitchen for the transaction. Afterward, the [Petitioner] left, and Mr. Elliott, Ms. Stephens, and Mr. Gill smoked some of the crack cocaine Mr. Elliott had purchased. Ms. Stephens thought they did not smoke all of the crack cocaine because

Mr. Elliott "wadded" something up and "put it in his pocket" after they finished smoking. Five or ten minutes later, the victims left. Ms. Stephens left to spend the night at her boyfriend's residence.

The next morning, Ms. Stephens's boyfriend drove her home. Later, her son called and told her that the victims were dead. Ms. Stephens called the [Petitioner] and asked if he had "bother[ed her] family." The [Petitioner] responded that he had not bothered them and that he "didn't go to Tullahoma[.]" Ms. Stephens said that she had not mentioned Tullahoma. Ms. Stephens's testimony was consistent with her interview with Officer Kennedy on March 3, 2011.

Richard Elliott, Jr., testified that at around 10:00 or 11:00 p.m., the victims came to his house and asked him to drink a beer with them. Mr. Elliott, Jr., agreed to drink one beer with them. Mr. Elliott, Jr.'s girlfriend and his children were in the house, and the victims visited with them. During the visit, Mr. Elliott "counted out" $2,100 in cash, "showing off."

Mr. Elliott, Jr., was concerned about the victims' driving while they were intoxicated and offered to let them stay at his house. The victims declined the offer. Before they left, Mr. Elliott made a telephone call. Mr. Elliott, Jr., did not know whom he called but heard him "trying to explain directions of how to get to Tullahoma to where he was at." Mr. Elliott told his granddaughter that he would be at her birthday party the next day. Mr. Elliott, Jr., estimated that the victims were at his house thirty to forty-five minutes. They left in Mr. Elliott's white van.

Officer Kennedy viewed the security video of the Quality Inn's lobby. The video showed that Mr. Elliott came into the office at 11:48 p.m. to reactivate the card key for his motel room.

The police examined Mr. Elliott's cellular telephone records and learned that between 7:45 p.m. on October 29 and 12:27 a.m. on October 30, twenty-two "communications"

occurred between the [Petitioner] and Mr. Elliott. Half of the communications were initiated by Mr. Elliott, and the others were initiated by the [Petitioner]. The last call from Mr. Elliott's telephone was made at 12:27 a.m. on October 30 to the [Petitioner's] cellular telephone. At the time the call was made, both telephones were accessing the same cellular tower. At 12:53 a.m. on October 30, 2010, a call was made from the [Petitioner's] telephone to Mr. Hill's telephone. Mr. Hill's telephone number was saved in the contact list of the [Petitioner's] telephone under Mr. Hill's nickname, "Black."

Casey Tarrant testified that sometime during the day of October 29, 2010, the [Petitioner], the [Petitioner's] nephew, Mr. Hill, Mr. Fuqua, Rontye Gray, and he were at Mr. Gray's house. They discussed the potential five-year prison sentences Mr. Tarrant and Mr. Hill were facing if convicted of the drug charges. Mr. Tarrant said that he was worried about going to prison, and the [Petitioner] responded, "'Don't worry about it. Everything is going to be all right.'" Mr. Hill, who was upset that he had been set up by Mr. Elliott, said that "he had money for—if something would happen to" Mr. Elliott. The [Petitioner] said, "'I got you.'"

Mr. Tarrant testified that after leaving Mr. Gray's house, he went to Ernie Mill's house. While there, he saw the [Petitioner] and Timica Jones. Mr. Tarrant thought that the [Petitioner] and Ms. Jones left Mr. Mill's house in a silver "van or some kind of vehicle." In early February 2011, Officer Kennedy interviewed Mr. Tarrant. The information Mr. Tarrant gave largely mirrored his trial testimony.

On January 12, 2011, Winchester Police Officer Jason Kennedy and Detective Chris Layne interviewed Timica Jones, the [Petitioner's] girlfriend. Ms. Jones initially was not "very forthcoming with information," but eventually she acknowledged that she and the [Petitioner] went to the Quality Inn on the night of the offenses. Ms. Jones told the officers that afterward, the [Petitioner] discarded a gun at the side of a road near the top of Sewanee Mountain. Approximately one week later, Officer Kennedy and other officers went to

- 6 -

Sewanee Mountain with Ms. Jones to search for the gun, but they were unable to locate it.

Ms. Jones testified that she and the [Petitioner] went "riding around" together on the night of October 29. The [Petitioner] was wearing a black jacket and blue jeans and was driving his mother's white, four-door car. They drove on a back road toward Tullahoma and met a man Ms. Jones had never seen before that night. Another man was in the vehicle with him. The [Petitioner] sold the man crack cocaine. Afterward, the [Petitioner] and Ms. Jones went to the [Petitioner's] mother's house on Elm Street in Winchester. The [Petitioner] went inside the house to check on his mother, and Ms. Jones waited in the car. When the [Petitioner] returned, they drove to Walmart in Winchester, and the [Petitioner] bought a "pay-as-you-go" cellular telephone. After leaving Walmart, they went to Sonic.

After they ate, the [Petitioner] and Ms. Jones went to a trailer park in Tullahoma. The [Petitioner] got out of the car and visited his brother for approximately five minutes. When the [Petitioner] returned, they drove to the Quality Inn in Tullahoma. The [Petitioner] backed into a parking space and got out of the car. Ms. Jones waited in the car. She had seen the [Petitioner] with a gun earlier that evening, knew he routinely carried a gun, and thought he had the gun with him when he got out of the car. Shortly after the [Petitioner] left, Ms. Jones heard two distant "pops" that sounded like fireworks. She looked around but saw nothing.

Ms. Jones said that the [Petitioner] returned to the car carrying something that appeared to be a "touchscreen" cellular telephone. When he got into the car, he leaned toward the back seat and seemed to be putting something in a bag. They left the motel and drove to the [Petitioner's] mother's house. Mr. Hill was driving away as they arrived. The [Petitioner] waved at Mr. Hill but did not speak with him. The [Petitioner] took the bag from the back seat and went into the house. Approximately ten minutes later, the [Petitioner] returned to the car with the bag and told Ms. Jones that they were "fixing to ride for a while." Ms. Jones said okay, and they

drove toward Cowan. Ms. Jones testified that she did not see the stolen cellular telephone again, but she knew that he threw it away as they drove past North Lake Elementary School.

Ms. Jones recalled that they were stopped for speeding in Cowan. As the officer was walking toward the car, the [Petitioner] reached into the back seat. Ms. Jones did not look, but she heard a bag rattling in the back seat. After the stop, the [Petitioner] drove up Sewanee Mountain and threw a bag out the window. Ms. Jones did not see what was in the bag. They stopped at a gasoline station/convenience store in Monteagle, and the [Petitioner] purchased cigarettes and drinks. He asked Ms. Jones to rent a motel room in Monteagle in her name and gave her cash to pay for the room. They went to the room and watched television, then Ms. Jones slept, and the [Petitioner] took a shower. After "a while," the [Petitioner] woke Ms. Jones, saying, "Let's go." They left the motel and drove toward Chattanooga. It was still dark outside when they stopped at a house. Ms. Jones did not know the person who was there. While they were at the house, the [Petitioner] and Ms. Jones had sex, then Ms. Jones slept for a while. They left the house near daylight and drove to South Pittsburg. The [Petitioner] stopped for gasoline and went into a store. They drove to the nursing home in South Pittsburg where the [Petitioner's] stepfather lived, and the [Petitioner] visited his stepfather for approximately twenty minutes. Afterward, the [Petitioner] and Ms. Jones returned to Winchester. He asked her where he could rent a car, and she told him about a place in Estill Springs. They drove to Estill Springs, rented a van, and then returned to his mother's house. They left the car at the house, and the [Petitioner] took Ms. Jones home in the van. The police verified the route Ms. Jones and the [Petitioner] took on the night of October 29 and on October 30 by examining their cellular telephone records.

Ms. Jones said that after she arrived home, she went to her room and slept. When she woke, it was dark outside. Her mother told her to look at a television news report about a murder in a motel room in Tullahoma. The report showed the victims' photographs, and Ms. Jones saw that one of the victims was the man who had bought cocaine from the

[Petitioner] on the back road. Ms. Jones told her mother that she and the [Petitioner] had been at that motel the previous night. Ms. Jones "started putting 2 and 2 together . . . and . . . freaking out." She called the [Petitioner] and asked about the news report. The [Petitioner] "told [her] to shut up, he didn't want to hear it and not to speak of it again, and if [she] did, [she] would come up missing." Ms. Jones did not call the police because she was afraid.

Officer Jason Kennedy testified that on February 15, 2011, Agent Kendall Barham and he interviewed the Appellant. They advised the Appellant of his Miranda rights, and he was cooperative. Officer Kennedy told the [Petitioner] that the police were investigating the homicides of the victims. The [Petitioner] said that he did not know the victims and would not recognize them from a photograph. During the interview, however, the [Petitioner] referred to Mr. Gill as "the bigger one." The Appellant said that he was with Ms. Jones on October 29 and that they were stopped by a police officer in Cowan. The [Petitioner] said that he was in Cowan all night and was not in Tullahoma. He denied knowing before the victims' deaths that they were responsible for "setting up" Mr. Hill. The [Petitioner] acknowledged that he sold crack cocaine and that he may have sold crack cocaine to Mr. Elliott through Viola Stephens, who was Mr. Gill's aunt. The interview, which had been videotaped, was shown to the jury.

On February 25, 2011, Officer Kennedy, Federal Bureau of Investigation (FBI) Agent Richard Poff, and Winchester Police Chief Dennis Young transported the Appellant from Winchester to Chattanooga. The [Petitioner] was advised of his Miranda rights. Officer Kennedy told the [Petitioner] that the police knew about the [Petitioner's] movements before, during, and after the murders. Agent Poff watched the [Petitioner] during the conversation. When Officer Kennedy said that the police knew the [Petitioner] had been at Mr. Gray's house with Mr. Gray, Mr. Hill, Mr. Fuqua, and Mr. Tarrant, the [Petitioner] nodded, "acknowledging that he had been at Mr. Gray's residence."

Officer Kennedy told the [Petitioner] that the police knew he sold crack cocaine to Mr. Elliott in the afternoon before the murders. The [Petitioner] again nodded affirmatively. Officer Kennedy told the [Petitioner] that the police knew he ate a hamburger at Sonic, that he bought a new cellular telephone at Walmart, and that he and Ms. Jones drove his mother's vehicle to the Quality Inn. The [Petitioner] "nodded his head affirmatively up and down, acknowledging that he had done each of those things." Officer Kennedy said that he told the [Petitioner] that the police knew the [Petitioner] threw a cellular telephone and a gun out the window of the vehicle as he was driving from Tullahoma. Officer Kennedy described the drive through Winchester and Cowan, up Sewanee Mountain, and the stop at a nursing home in South Pittsburg. Chief Young also revealed that the victims were shot. The [Petitioner] said, "'Yeah,' and nodded his head."

Agent Poff testified that before they left the jail, the [Petitioner] was read his <u>Miranda</u> rights. He told the [Petitioner] that "different people had different motives for killing someone, and . . . said that there was a difference between killing someone simply to rob a person or killing someone to avenge a relative." Agent Poff asked the [Petitioner] if he had killed the victims to avenge a relative or just to rob them. At that point, the [Petitioner's] "eyes filled up with tears, and he nodded his head forward twice, acknowledging that the reason he had killed them was to avenge a relative." Officer Kennedy noted that the [Petitioner] "had previously said he would never hurt anyone unless they had harmed his family" and asked if the [Petitioner] had killed the victims to protect Mr. Hill. Again, the [Petitioner] "nodded his head forward, acknowledging that was why he had killed them."

Chief Dennis Young testified he told the [Petitioner] the police had heard that Mr. Fuqua acquired the gun used in the murder, that Mr. Fuqua gave the gun to Mr. Hill, and that Mr. Hill gave the gun to the [Petitioner]. The [Petitioner] did not react to Chief Young's statement. Chief Young said the police had heard that Mr. Fuqua and Mr. Hill each paid the

[Petitioner] $2,500 to kill the victims. The [Petitioner] responded, "'I didn't get paid.'"

Chief Young told the [Petitioner] that he understood the [Petitioner's] wanting to protect his nephew, Mr. Hill, but that he did not understand the [Petitioner's] protecting Mr. Fuqua, who was not a relative. The [Petitioner] replied, "'I will take care of it when I get out.'" Officer Kennedy asked the [Petitioner] to provide some details about the murders, and the [Petitioner] asked for an attorney. At that point, the questioning ended. Ten or fifteen minutes later, the [Petitioner] "pronounced that anyone that he had ever laid hands on is still walking and that he had not killed anyone."

Kimberly Eddings testified at trial that a couple of weeks prior to the murders, she went "riding around" in Tullahoma with the [Petitioner], who was her boyfriend at the time, and Ernie May. They drove to the Quality Inn and saw a white minivan parked in the motel parking lot. The [Petitioner] said that "he was going to hit a lick," which Ms. Eddings thought meant he intended to rob someone. The [Petitioner] was wearing a dark blue or black hoodie with the hood up. He and Mr. May put on gloves, got a knife, exited the car, and walked upstairs to a motel room. Ms. Eddings stayed in the car.

Mrs. Elliott, the victim's wife, testified that she and her niece were in Mr. Elliott's motel room on the "top floor" at the Quality Inn. Mrs. Elliott heard a knock and opened the door. Mr. May and the [Petitioner] inquired as to Mr. Elliott's whereabouts, and Mrs. Elliott responded that he was not in the room and that they could return later. She tried to close the door, but the men stopped her. Shortly thereafter, the men returned to the car and left with Ms. Eddings. Ms. Eddings testified that the [Petitioner] and she ended their relationship shortly after the attempted robbery, and the [Petitioner] and Ms. Jones began dating.

Terry Whitaker, who was serving a sentence in a federal prison in Kentucky for selling crack cocaine, testified that in November 2011, he was housed in a federal holding facility in

- 11 -

Bradley County and that he shared a cell pod with the [Petitioner]. The [Petitioner] told Mr. Whitaker that he went to a hotel room and shot two people who were confidential informants. The [Petitioner] said that a female was waiting for him in the car and that he drove away after the shooting. The [Petitioner] said that "he did it for somebody else, one of his family members and all of that." Mr. Whitaker recalled that the family member's "name was A. Hill or something like that, Andrew Hill or something, A. Hill something."

Shannon Quintel Pentecost, who was serving a sentence in a federal prison in Arkansas for selling crack cocaine, testified that he had known the [Petitioner] for many years. Just after Halloween 2010, the [Petitioner] called Mr. Pentecost and said he needed to talk. Mr. Pentecost told the [Petitioner] that he was at a friend's house and that the [Petitioner] should come to the house. When the [Petitioner] arrived, the [Petitioner] got into a car with Mr. Pentecost, and they smoked marijuana. The [Petitioner] told Mr. Pentecost, "'Man, I f[***]ed up.'" Mr. Pentecost asked what was wrong. The [Petitioner] responded, "'Man, me and Mica was going through so much. I should have knocked her off, too.'" Mr. Pentecost asked, "'For what?'" The [Petitioner] said, "'Because she was there when I murdered those white guys.'" The [Petitioner] told Mr. Pentecost that he needed "something," and Mr. Pentecost gave him some crack cocaine. The [Petitioner] told Mr. Pentecost that he shot the two white men in the head and "made it look like it was suicide."

Mr. Pentecost said that in January 2012, he told the police about his conversation with the [Petitioner]. On April 11, 2012, he gave a second statement to the authorities. In the second statement, Mr. Pentecost said that the Appellant said that the shooting occurred at a hotel in Manchester.

Terry Elliott, Mr. Elliott's brother, testified for the [Petitioner] that he went to the Quality Inn around 10:00 or 10:30 a.m. on October 30, 2010. After he arrived, he learned that Mr. Nixon had found the victims' bodies. Mr. Nixon told Terry Elliott that he went through Mr. Elliott's pockets before

- 12 -

the police arrived, looking for Mr. Elliott's mother's telephone number.

On cross-examination, Terry Elliott said that he did not tell the police that Mr. Nixon mentioned going through Mr. Elliott's pockets. He said, however, that he thought Mr. Nixon had already disclosed that information to the police.

Ellen Meeks testified that in the fall of 2010, she was working at Dunlap's Market, which was located on Highway 130 between Winchester and Tullahoma. Ms. Meeks knew Mr. Elliott and said that "[a]ll [she] really knew about him [was that] he partied a lot and drank." She said that Mr. Elliott was a drug addict and often was intoxicated when he came into the store. Mr. Elliott typically came into the store to cash checks. The checks usually were for $500 or more and written by Mr. Nixon, who was a frequent customer of the store. Ms. Meeks said that approximately three months before Mr. Elliott's death, his visits became more frequent, sometimes as often as three times a day.

Ms. Meeks said that she had seen Mr. Elliott and Ray Nixon together "a handful of times" in the months before Mr. Elliott's death. On one occasion, Ray Nixon was upset and angry that his father gave money to Mr. Elliott but would not give any money to him.

Rakish Patel testified that other guests stayed in the same wing of the Quality Inn as the victims on the night of October 29, 2010. None of the guests lodged a noise complaint that night.

State v. Marcus Thurman Wade, No. M2014-01418-CCA-R3-CD, 2016 WL 5416340, at *1-7 (Tenn. Crim. App. at Nashville, Sept. 28, 2016) (footnote omitted).

On direct appeal, this court affirmed the Petitioner's convictions for the first degree murders of the victims and especially aggravated robbery and his total effective sentence of life without parole plus thirty-five years. Id. Subsequently, the Petitioner filed a petition for post-conviction relief and several amended petitions, alleging numerous claims of ineffective assistance of counsel.

At the post-conviction hearing, Investigator Todd Hindman with the Franklin County Sheriff's Department testified that after receiving a subpoena duces tecum from post-conviction counsel, he looked for a February 25, 2011 recording pertaining to the Petitioner, but he was unable to find such a recording.

On cross-examination, Investigator Hindman said that he was with the Franklin County Sheriff's Department at the time of the Petitioner's arrest but that he did not participate in the arrest.

Jason Kennedy testified that at the time of the Petitioner's arrest, he was an officer with the Tullahoma Police Department and that he was the "case agent" in the investigation of the victims' death. Officer Kennedy said that the crimes occurred around the end of October 2010. Officer Kennedy and TBI Agent Barham interviewed the Petitioner at the Franklin County Sheriff's Department on February 15, 2011. The Petitioner was in custody at the time. Prior to the interview, the Petitioner was advised of his Miranda rights. The interview lasted approximately one hour.

Officer Kennedy said that during the interview, the officers talked about the Petitioner's mother, who was in the hospital. In order to establish a rapport with the Petitioner, they also discussed sports and other subjects. The interview did not result in a confession.

Officer Kennedy said that "shortly thereafter," he, FBI Agent Poff, and Winchester Police Chief Young drove the Petitioner to Chattanooga, where he was facing federal drug charges;[1] Officer Kennedy thought the charges related to crack cocaine. Officer Kennedy said that Agent Poff was going to serve a federal indictment on the Petitioner and asked Officer Kennedy if he wanted to "ride along." Agent Poff knew Officer Kennedy was involved in the investigation of the victims' death.

Officer Kennedy acknowledged that he received a subpoena duces tecum from post-conviction counsel for a recording of the Petitioner's interview at the Franklin County Jail on February 25. Officer Kennedy said that he was aware of only one video and that it was Agent Barham's interview of the Petitioner at the Franklin County Sheriff's Department. Officer Kennedy acknowledged that the trial transcript reflected that he testified that Agent Poff advised the Petitioner of the charge against him and his Miranda rights and that the Franklin County Sheriff's Department had "audio and video of where we were standing." Officer Kennedy explained that Agent Poff had advised the Petitioner of the federal drug charge against him. The conversation took place at the jail.

---

[1] Officer Kennedy said that at the time of the post-conviction hearing, he was employed at Tullahoma High School and that Agent Poff and Chief Young were both deceased.

Officer Kennedy said that the reason for his conversation with the Petitioner on February 15 was to discover the Petitioner's whereabouts on the night of the murders. The Petitioner "made a statement," and Officer Kennedy "disproved his statement." During the drive on February 25, Officer Kennedy confronted the Petitioner with his earlier statement. Officer Kennedy said before the confrontation, they may have talked about the Chicago Cubs and sports, but he knew they talked about family because the Petitioner had mentioned in the previous interview that he would not hurt anyone "unless it had to do with his family." Post-conviction counsel asked, "Did it go through your mind, either on the drive to Chattanooga or before the drive to Chattanooga, that to start off with a Miranda waiver and reading him his Miranda rights was not going to work in your favor as far as the atmosphere of the conversation would be concerned," and Officer Kennedy responded, "No, no."

On cross-examination, Officer Kennedy said that no recording was made of their conversation during the car ride on February 25. Officer Kennedy did not know of any recording from the Franklin County Sheriff's Department of the Petitioner's being advised of Miranda warnings by Agent Poff. Regardless, Officer Kennedy insisted that he saw Agent Poff advise the Petitioner of his Miranda rights.

On redirect examination, Officer Kennedy explained that the February 15 interview was conducted inside a "mobile trailer[]" that was set up outside of the Franklin County Sheriff's Department. Officer Kennedy said that on February 25, when the Petitioner was removed from his cell, Agent Poff advised him of his Miranda rights. Thereafter, they left for Chattanooga. Officer Kennedy said that he testified at trial that he thought Agent Poff's advising the Petitioner of his Miranda rights on February 25 had been recorded because Officer Kennedy had been in many correctional facilities and most of them had "some type of audio and video" recording equipment inside the facility. Officer Kennedy thought the Franklin County Jail had cameras but was not completely certain.

The Petitioner testified that he recalled "everything" from February 25 and that he was not advised of his Miranda rights that day. The Petitioner stated that he had met Agent Poff and Officer Kennedy at the intake in the booking area and that he had told them he did not want to be near Chief Young because Chief Young had assaulted him on the night of February 11.

The Petitioner acknowledged that the trial court heard a motion to suppress his February 15 statement. The issue in the motion was whether the Petitioner had requested a lawyer. The Petitioner maintained that he gave the officers permission to ask him one question and then he requested a lawyer. The Petitioner said that the officers did not end

- 15 -

the conversation and that they talked about his mother's hospitalization, the Chicago Cubs, and "the state of affairs of someone being out of jail trying to get a job and the drug trade."

The Petitioner said that he had used drugs since he was eleven years old and that "[i]t has affected my life up until still this day." The Petitioner maintained that because of his drug usage, "a lot of things, I don't completely understand, you know, a little bit over my head, you know, but you know I just try my best." The Petitioner said that he attended school through the eleventh grade but that he "got held back a couple of times." The Petitioner explained, "Academics was not my thing." The Petitioner thought his drug usage affected his ability to get a job and negatively impacted the decisions he made on a daily basis. The Petitioner said he was willing to testify at the suppression hearing that he was under the influence of drugs during the February 15 interview and was unable to make an intelligent decision regarding whether to proceed with the interview.

The Petitioner stated that he was a black man and that no black people served on the jury which convicted him. The Petitioner said that if he had testified at trial, he would have explained, "I was their drug dealer, not their murderer." He maintained that in the two and one-half months prior to the victims' deaths, he made $25,000 to $27,000 from selling drugs to the victims, but his relationship with them was not "buddy buddy." The Petitioner stated that he was able to make so much money from them because he was the only person who would sell the victims drugs because they were known confidential informants.

The Petitioner said that the day prior to the murders, he made several drug sales to the victims. For a couple of the sales, he met the victims in a rural area. The Petitioner said that the victims were not reluctant to meet him in secluded areas. He explained that he did not testify because he "was just so over [his] head," and he "believed in [his] lawyer." The Petitioner said that he was "stunned" on the day of trial, that he "didn't fully understand," and that he was "in a situation where I really didn't know what I could do when it came time for our defense." The Petitioner said that he and trial counsel had one conversation about whether the Petitioner would testify at trial. The next time they met, trial counsel asked the Petitioner if he wanted to testify. The Petitioner told trial counsel that based on shows the Petitioner had watched on television, it did not seem like a good idea for a defendant to testify because the prosecution would "be able to bring up other things." Nevertheless, the Petitioner told trial counsel that he "would rather be their drug dealer than their murderer." The Petitioner said, however, that trial counsel "felt and I felt that it wasn't what we needed to do, and then the next time we discussed it, he showed me a piece of paper to sign that I wasn't going to take the stand." The Petitioner said that he told and gave trial counsel everything he could about his relationship with the victims. The Petitioner also told trial counsel "about the other relationships with other people and everything, and . . . it did no good."

On cross-examination, the Petitioner said that he was taken into custody on Thursday, February 3. The Petitioner said that he "gave the wrong date on the beating assault from Chief Young. It was on Thursday, February 3rd, that he beat me in my front yard."

The Petitioner recalled that at the February 15 interview he bonded with Officer Kennedy because they were both big Chicago Cubs fans. They also discussed the Petitioner's mother, whom the Petitioner described as his "best friend and unconditional love." During the interview, the Petitioner wrote a note to his mother and gave it to the officers to take to her in the hospital.

The Petitioner said that trial counsel's "strategy was, he was going to pit this rich white man against me as a drug dealer with this all-white jury." The Petitioner said that prior to trial, he thought he should not testify. He based this decision upon the advice of trial counsel and the things he had seen on television. The Petitioner said that at trial, "things can change" and that he "found out [his] lawyer was with [the State] more than he was with [the Petitioner] because he put up no defense for [the Petitioner]."

The Petitioner said that he remembered the trial court's advising him of his rights to testify or not testify. The Petitioner maintained, however, that "most of what the Judge was saying and what you all were saying was just babble to me." The Petitioner hoped trial counsel had the Petitioner's "best interest at heart" and that trial counsel "knew what you all [were] talking about."

Trial counsel testified that he graduated from law school in 1988 and that he had been practicing criminal law since that time. Trial counsel was appointed to represent the Petitioner at either the end of June 2012 or the beginning of July 2012 and was the second lawyer who was appointed to represent him. Trial counsel applied for and received funds to hire an expert witness. Trial counsel and co-counsel decided that given the number of witnesses and the "mountain of evidence[,] . . . rushing the government to trial would be to our advantage." Accordingly, on July 5, 2012, trial counsel filed a motion for speedy trial, and the case was tried in February 2013.

Trial counsel said that he, co-counsel, and the Petitioner decided that the best defense strategy was to show that the Petitioner was a drug dealer, not a killer. Trial counsel did not think the Petitioner needed to testify in order to establish that defense. Trial counsel explained that the State was going to introduce proof of "drug deals" the Petitioner had made, and "we thought we could flip that around on them because we thought we had some alternative theories of guilt." Trial counsel said that he discussed the matter with the Petitioner, that he found the Petitioner "to be much more sophisticated in the criminal

process tha[n] he has testified to today," and that trial counsel often thought the Petitioner "was the smartest person in the room."

Trial counsel said that he reviewed the video from the February 15 interview. Trial counsel said that the Petitioner "never gave me any indication that he had any mental deficiency issue that could be exploited." Trial counsel said that the Petitioner's videotaped interview was not beneficial to a mental health claim. Trial counsel stated:

> Given the relaxed demeanor that [the Petitioner] displayed, cutting up, casual talking, no pressured speech, no evidence that he was under any pressure, I felt like putting on evidence of diminished capacity during that period of time wasn't going to get us anywhere. We were either going to get it thrown out on the 5th Amendment [Miranda] issue or we weren't.

Trial counsel raised the Miranda issue at trial and on appeal.

On cross-examination, trial counsel said the defense planned to show that the Petitioner was not at the motel at the time of the killing. Trial counsel recalled that the motel had videos taken two weeks before the murders. A Rule 404(b) hearing was held to determine the admissibility of the videos to show that the Petitioner was there "casing out the place" for the murders. Trial counsel could not recall whether he "examine[d] any videos when [the Petitioner] entered the parking lot or even went up to the hotel rooms to case it out." Trial counsel said that his investigator examined the videos showing the day of the murder, but trial counsel could not recall if he examined the videos. The investigator did not report seeing the Petitioner at the motel, and trial counsel did not think the Petitioner's car was captured on the motel's video. Trial counsel thought the Petitioner's car was probably parked on a street behind the motel. Trial counsel acknowledged that he did not introduce any of the videos. The defense argued that the victims were the Petitioner's best customers and were very profitable and that if the Petitioner had killed them, "he was actually murdering the goose that laid the golden egg." Essentially, the defense theories were that the Petitioner was not there, that the Petitioner did not kill the victims, and that the Petitioner would not have killed his "best customers."

Trial counsel thought the only statement the Petitioner gave that was videoed and recorded was the one "he gave to the TBI agent and another officer." Trial counsel filed a motion to suppress the statement, but the motion was denied. Trial counsel also raised the issue on direct appeal. Trial counsel said the Petitioner made two other statements that were not recorded; however, testimony about the statements was admitted at trial. Trial counsel did not file motions to suppress the two unrecorded statements.

Officer Kennedy was recalled by the State. Officer Kennedy testified that after the murders, he spent quite a bit of time at the Quality Inn in Tullahoma and that he became very familiar with the layout of the grounds and the motel. The motel had one security camera operating at the time of the murders, and it was in the office. The camera was focused on the cash register where people checked in. A small area outside where cars could pull up under an awning could be seen. The State introduced the security video at trial.

On cross-examination, Officer Kennedy said the State also introduced a video which showed the victims' van parked under the awning. Regarding whether Agent Poff advised the Petitioner of his Miranda rights in the booking area, Officer Kennedy responded, "I said it was in a secure facility, and . . . what [the Petitioner] is saying is probably correct. From what I recall, they brought him out of his cell, and that's where Agent Poff advised him of what he was charged with and read him his rights."

The post-conviction court held that the Petitioner had failed to prove that trial counsel was deficient or that the Petitioner suffered any prejudice. On appeal, the Petitioner challenges this ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, the Petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When the Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the [P]etitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the Petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause [the P]etitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

On appeal, the Petitioner contends that trial counsel was ineffective by (1) advising the Petitioner not to testify; (2) failing to request a psychological evaluation of the Petitioner; (3) failing to introduce at the suppression hearing proof of the Petitioner's mental capacity; (4) failing to challenge the venire's racial makeup; (5) failing to request funds for expert witnesses; (6) failing to investigate and review motel camera footage; and (7) failing to file a motion in limine to block evidence of the Petitioner's drug transactions. We will address each of these contentions in turn.

A. Right to Testify

First, the Petitioner contends that trial counsel was ineffective by advising the Petitioner not to testify at trial. The Petitioner contends that his testimony regarding the amount of money he was making from the victims would have strengthened his defense. The Petitioner cites State v. Zimmerman, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991), in which this court listed the following factors for consideration in determining whether counsel was ineffective in advising a petitioner not to testify:

> (1) only the victim and the defendant were present when the offense was committed;

(2) only the defendant could present a "full version of [his] theory of the facts";

(3) the defendant's testimony could not be impeached by prior criminal convictions;

(4) the defendant could give an account of the relationship with the victim; and

(5) the attorney had let in objectionable, prejudicial testimony with the intention of clarifying it with the testimony of the defendant.

State v. Zimmerman, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991).

However, the instant case is distinguishable from Zimmerman. In Zimmerman, the defense claimed that the defendant killed her husband in self-defense, and trial counsel promised the jury during his opening statement that the defendant would testify. However, counsel did not have the defendant testify and did not explain the defendant's failure to testify, and counsel failed to adduce any evidence or witnesses to support the theory counsel outlined in his opening statement. See 823 S.W.2d at 221. The present case is not a self-defense case, and trial counsel did not promise the jury that the Petitioner would testify. See Mindy Sue Dodd v. State, No. M2006-02384-CCA-R3-PC, 2007 WL 2949020, at *9-10 (Tenn. Crim. App. at Nashville, Oct. 10, 2007). We note that trial counsel was able to present evidence other than the Petitioner's testimony to support the defense's theory that the Petitioner was not present during the victims' murders, and trial counsel established the Petitioner's relationship with the victims through other witnesses. Further, trial counsel testified that the State's proof established that the victims were confidential informants whose assistance resulted in several indictments and that the Petitioner had no motive to kill his best customers. Additionally, the Petitioner's testimony could have been impeached with his prior convictions. Finally, no proof exists that trial counsel let in objectionable proof with the intention of clarifying it with the Petitioner's testimony. The post-conviction court found that the Petitioner was advised of his right to testify and that the Petitioner knowingly and voluntarily waived that right. See Momon v. State, 18 S.W.3d 152, 163 (Tenn. 1999). We, like the post-conviction court, conclude that the Petitioner failed to establish a reasonable probability the result of the trial would have been different if he had testified.

### B. Psychological Evaluation

The Petitioner contends that trial counsel was ineffective by failing have the Petitioner psychologically evaluated. The Petitioner asserts that "[d]uring a key interview, he was under the influence of drugs," that the Petitioner's use of drugs was extensive, and that the Petitioner was unable to graduate from high school. The Petitioner asserts that his

history of drug use negatively impacted his ability to make decisions and that he was therefore "unfit for trial." The Petitioner argues that the result of the trial would have been different if he had been psychologically evaluated.

The Petitioner recognizes that his argument is "somewhat weak," but he maintains that he cannot strengthen his position through expert testimony because he is indigent and the State will not approve funding for an expert in non-capital post-conviction cases. The Petitioner maintains that the failure to provide funding for expert witnesses in non-capital post-conviction cases "violates the Equal Protection Clause of the United States Constitution and the Law of the Land Clause of the Tennessee Constitution."

The record does not contain any evidence that the Petitioner requested, and was denied, funds for an expert witness. See Tenn. R. App. P. 36(a); see also Tenn. R. App. P. 24(b). Additionally, he did not contend in the post-conviction court that his constitutional rights were violated by the rules denying funding for an expert witness. See Joseph Cordell Brewer, III v. State, No. W2016-02106-CCA-R3-PC, 2018 WL 446686, at *3-4 (Tenn. Crim. App. at Jackson, Jan. 16, 2018). Therefore, the Petitioner has arguably waved this issue.

In any event, our supreme court has held that an indigent petitioner is not entitled to state funds for an expert in a petition for post-conviction relief in a non-capital case. Davis v. State, 912 S.W.2d 689, 696-97 (Tenn. 1995). This court is bound by the decisions of the Tennessee Supreme Court. Wesley Jones v. State, No. W2015-01481-CCA-R3-PC, 2016 WL 4357422, at *22 (Tenn. Crim. App. at Jackson, Aug. 11, 2016).

### C. Proof of Mental Capacity at Suppression Hearing

The Petitioner contends that trial counsel was ineffective by failing to introduce proof of the Petitioner's mental capacity at the suppression hearing. Specifically, the Petitioner contends that he was under the influence of drugs at the time of the interview. The Petitioner maintains "that had the trial court heard of his diminished capacity, the trial court would have found his interviews with police . . . to be involuntary, particularly after [the Petitioner] told the police that he did not want to talk to them."

The State acknowledges that the post-conviction court did not address this claim in its order but asserts that the record is sufficient for this court to conduct a de novo review of the issue and to determine that the Petitioner failed to prove that trial counsel was ineffective in this regard.

On direct appeal, the Petitioner challenged the trial court's denial of his motion to suppress his statement to Officer Kennedy and Agent Barham, "arguing that the officers

should have stopped all questioning after he asserted his Fifth Amendment right to remain silent." State v. Marcus Wade, No. M2014-01418-CCA-R3-CD, 2016 WL 5416340, at *7 (Tenn. Crim. App. at Nashville, Sept. 28, 2016). This court affirmed the trial court's rulings that "although the [Petitioner] initially stated that he did not want to talk, he nevertheless continued speaking with the officers"; "the officers did not pressure or threaten the [Petitioner] to get him to make a statement"; "the [Petitioner], after being advised of his Miranda rights and saying that he understood those rights, freely spoke with the officers"; and "during the conversation with the officers, the [Petitioner] remarked that speaking with the officers might benefit him in some way." Id. at *10.

To show prejudice when raising a claim of ineffective assistance of counsel regarding a motion to suppress, the "Petitioner must show by clear and convincing evidence that (1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested." Vaughn v. State, 202 S.W.3d 106, 120 (Tenn. 2006) (citing Strickland, 466 U.S. at 687). "In essence, the petitioner should incorporate a motion to suppress within the proof presented at the post-conviction hearing." Terrance Cecil v. State, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. at Nashville, Sept. 12, 2011).

As we stated on the prior issue, the post-conviction court accredited trial counsel's testimony that "[t]here were many times that [trial counsel] thought [the Petitioner] was the smartest person in the room." Counsel also noted the Petitioner's demeanor and interaction during the statement. Additionally, we note that trial counsel testified that he "felt like putting on evidence of diminished capacity during that period of time wasn't going to get us anywhere." Trial counsel said that he chose instead to try to suppress the statement on Fifth Amendment grounds, namely that the Petitioner had not been advised of his Miranda rights. Therefore, trial counsel's choice not to pursue a suppression motion regarding diminished capacity was a tactical, strategic decision. On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). Moreover, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." Taylor v. State, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). The Petitioner is not entitled to relief on this issue.

### D. Racial Composition of Jury Venire

The Petitioner contends that trial counsel was ineffective for failing to challenge the racial composition of the jury venire. The Petitioner again contends that he needed an expert witness to testify at the post-conviction hearing in order to establish that he was

prejudiced by the racial composition of the jury venire. However, as we stated *supra*, the Petitioner was not entitled to State funds for an expert witness in a non-capital post-conviction case. See Davis, 912 S.W.2d at 695-97. Further, a challenge to the racial composition of the jury venire can be made without expert testimony.

A defendant is constitutionally entitled to a jury that is drawn from a "fair cross section of the community." Taylor v. Louisiana, 419 U.S. 522, 527-28 (1975). Regardless, a defendant is "not entitled to a jury of any particular composition because the fair cross-section requirement does not impose a requirement that the jury actually chosen mirror the community or reflect the various distinctive groups in the population." State v. Hester, 324 S.W.3d 1, 39 (Tenn. 2010). In determining whether a jury was properly selected from a fair cross-section of the community, we utilize the three-pronged test set forth in Duren v. Missouri, 439 U.S. 357, 364 (1979), which states that the Petitioner must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community;
> (3) that this under representation is due to systematic exclusion of the group in the jury-selection process.

State v. Mann, 959 S.W.2d 503, 535 (Tenn. 1997) (citing Duren, 439 U.S. at 363) (footnote omitted).

We note that the post-conviction court found that "trial counsel indicated that this issue was considered and that he felt the venire represented the overall population breakdown of Coffee County." We have examined trial counsel's testimony at the post-conviction hearing and can find no such testimony. Nevertheless, although "the Petitioner has alleged the exclusion of a distinctive group based on race, he has not alleged any sort of systematic exclusion." Josh L. Bowman v. State, No. E2016-01028-CCA-R3-PC, 2017 WL 1449232, at *8 (Tenn. Crim. App. Apr. 24, 2017) (citations omitted). The Petitioner's only proof on this issue was his testimony that he was black and that no black people served on his jury. "[A]lthough the Petitioner . . . testified regarding how many African Americans were on the panel, no proof was introduced regarding what percentage of the community was African American." Id. (citing State v. Stephens, 264 S.W.3d 719, 733 (Tenn. Crim. App. 2007)). Accordingly, the Petitioner has failed to establish any deficiency by trial counsel or that he suffered any prejudice by the alleged deficiency.

E. Funds for Expert Witnesses

The Petitioner contends that trial counsel was ineffective "for not requesting funds for independent experts to present [the Petitioner's] theory of the case." The Petitioner asserts that without State funding for an expert witness to testify at the post-conviction hearing, he cannot prove that an expert would have made a difference at trial. As we have concluded supra, the Petitioner is not entitled to expert funding in a non-capital post-conviction proceeding. See Davis, 912 S.W.2d at 695-97. Further, we note that the Petitioner did not specify the type of expert trial counsel should have hired and failed to explain how the lack of an expert hampered his defense. Accordingly, the Petitioner's failure to adequately brief the issue has waived this claim. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) ("The brief of the appellant shall contain . . . [a]n argument, which may be preceded by a summary of argument, setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on.").

## F. Video Footage

The Petitioner contends that trial counsel was ineffective by failing to investigate and review the videos from the motel's camera. The Petitioner noted that trial counsel could not recall whether he had reviewed the motel security videos from the day of the murder and from the earlier occasion when the Petitioner was "casing" the motel but that the defense investigator reviewed the video from the day of the murder and did not see the Petitioner at the motel. However, the Petitioner did not introduce the videos as exhibits at the post-conviction hearing, arguably waiving the issue. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7). The Petitioner did not explain what trial counsel could have found by examining the videos. Additionally, although the Petitioner complains that trial counsel did not introduce the video from the day of the murder at trial, he acknowledges that the video had already been introduced by the State during its case-in-chief. The Petitioner complains that "there was no reason to emphasize that the video did not show [the Petitioner]." The post-conviction court found that "testimony at the hearing showed that the only camera footage available for that evening was from inside the lobby, not outside the hotel room. The Court recalls no evidence to show that the Petitioner entered the lobby area during that time." The Petitioner did not establish how further review of the videos could have changed the result of his trial.

## G. Motion in Limine

Finally, the Petitioner contends that trial counsel was ineffective by failing to file a motion in limine to prevent the State from introducing evidence that the Petitioner "sold

large amounts of crack cocaine." The Petitioner asserts that "[g]iven the heinous nature of selling cocaine, any probative value was substantially outweighed by the danger that the jury would unfairly convict [the Petitioner] once they heard he was a cocaine dealer." However, the proof at the post-conviction hearing was that trial counsel and the Petitioner agreed that the Petitioner's best defense was to show that the victims were highly profitable customers and that he had no motive to kill the victims. Therefore, allowing proof of the Petitioner's drug sales was necessary to support the defense. "When reviewing trial counsel's actions, this court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics." Irick v. State, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998). The Petitioner is not entitled to relief in this regard.

### III. Conclusion

Finding no error, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE